## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| GARTOR KIKI BROWN, | No. 3:19-CV-00839 |
| Plaintiff, | (Chief Judge Brann) |
| v. | |
| WAXFORD, *et al.*, | |
| Defendants. | |

## MEMORANDUM OPINION

### JULY 14, 2022

Plaintiff Garter Kiki Brown filed this *pro se* Section 1983[1] action, asserting constitutional tort and state-law claims against numerous prison officials at the State Correctional Institution in Huntingdon, Pennsylvania (SCI Huntingdon). Presently pending is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. The Court will grant in part and deny in part Defendants' Rule 56 motion.

---

[1] 42 U.S.C. § 1983. Section 1983 creates a private cause of action to redress constitutional wrongs committed by state officials. The statute is not a source of substantive rights; it serves as a mechanism for vindicating rights otherwise protected by federal law. *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 284-85 (2002).

## I.    FACTUAL BACKGROUND[2]

At all times relevant to this lawsuit, Brown was incarcerated at SCI Huntingdon.[3]  Brown's claims involve a relatively brief stretch of time in late July and early August 2018.  Brown alleges that, on July 26, 2018, he was served a food tray that had been intentionally contaminated with a small, sharp piece of metal by defendant correctional officer Duane Plocinik.[4]  Brown avers that he unknowingly swallowed this piece of metal while eating, which caused him to choke and cough, spit blood, spill his food tray, and bang on the cell door for assistance.[5]

Brown attests that Plocinik returned to the cell and admitted to putting the metal in Brown's food.[6]  According to Brown, Plocinik took this action because Brown had previously filed a PREA sexual harassment complaint against him in April 2018 and because Plocinik had just learned the day before that Brown was

---

[2]    Local Rule of Court 56.1 requires that a motion for summary judgment be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." LOCAL RULE OF COURT 56.1.  A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried. *Id.*  Unless otherwise noted, the following factual background derives from the parties' Rule 56.1 statements of material facts. *See* Docs. 88, 98. To the extent the parties' statements are undisputed or supported by uncontroverted record evidence, the Court cites directly to the Rule 56.1 statements.

[3]    Doc. 88 ¶ 1.

[4]    Doc. 1 ¶¶ 3, 8-9, 41 (Brown filed a verified complaint, signed under penalty of perjury); Doc. 20 (providing full names of Defendants).

[5]    Doc. 99 ¶¶ 4-5.

[6]    *Id.* ¶ 5; Doc. 88-1, May 21, 2021 Brown Dep. 10:2-21 [hereinafter "Brown Dep. __"] (testifying that Plocinik told him to "stop crying over the little metal that he put" in Brown's food tray).

intending to file a separate federal lawsuit against him and other SCI Huntingdon officials.[7]

Brown claims that, while he was coughing and choking from the metal shard, defendant correctional officer Timothy Grove was alerted to Brown's situation by other inmates, but that Grove ignored Brown and "walked away."[8] Later that evening, Brown alleges that a nurse who was handing out evening medications was summoned to his cell, but that defendant correctional officer Joshua Kirsch told the nurse that Brown was "faking," convincing the nurse "to ignore the serious" medical emergency Brown believed he was facing.[9]

Brown avers that he next encountered defendants Lieutenant Christopher Franks, Superintendent and Facility Manager Kevin Kauffman, and Medical Director Paula Price.[10]  He attests that Price told him to put in a sick call and that Franks and Kauffman ignored him.[11]  Brown relates that, after Franks, Kauffman, and Price left, water began entering his cell from under the door.[12]  According to prison officials, Brown intentionally flooded his cell by clogging his toilet.[13]

---

[7]   *See* Doc. 1 ¶ 31 (alleging that Plocinik delivered copies of the lawsuit to Brown on July 25, 2018, and told Brown that he had read the papers and warned Brown not to file them); Doc. 99 ¶ 2 (attesting to same).
[8]   Doc. 99 ¶ 5; Brown Dep. 11:20-22.
[9]   Doc. 99 ¶ 6; Brown Dep. 13:4-9.
[10]  *See* Doc. 1 ¶¶ 14-15, 22; Doc. 97-5 at 27; Doc. 99 ¶ 7; Brown Dep. 13:9-12.
[11]  Doc. 99 ¶ 7; Brown Dep. 13:9-12.
[12]  Brown Dep. 13:12-13, 23-25.
[13]  *See* Doc. 97-4 at 46.

Brown denies those accusations and attests that the water came from an outside source.[14]

Brown was then moved to a different cell—identified on his prison cell history as "GA 1016" in the Restricted Housing Unit (RHU)—where he remained until July 31, 2018.[15]  Defendants claim that Brown was placed in a "dry cell."[16] Brown refers to this cell as the "bluesing" cell, based on the conditions that he maintains he endured during the days he spent there and his belief that punitive placement in this cell is an unwritten policy or custom at SCI Huntingdon.[17]

As to his conditions of confinement, Brown claims that the "bluesing" cell was contaminated with feces, infested with flies, and had a strong urine smell.[18] He testified that he was stripped of all his clothing, was not given a mattress or blanket, and did not have access to clean water for multiple days.[19]  He attests that the cell's air conditioning was turned up so high that "ice particles" formed on the

---

[14]  Doc. 98 ¶ 5.

[15]  Doc. 88 ¶ 7; Doc. 98 ¶ 7.  Brown claims he was moved to cell GA 1016 on July 26, 2018, but Brown's prison cell history records reflect that he was moved on July 27, 2018.  *See* Doc. 97-4 at 54.

[16]  *See* Doc. 88 ¶ 6.  "A 'dry cell' is a cell that lacks water—all standing water has been drained from the toilet, the room's water supply has been shut off, and the sink and toilet have been capped to prevent inmate access. An inmate may be placed in a dry cell when prison staff have observed the inmate attempt to ingest an item of contraband or they learn that the inmate is attempting to introduce contraband into the prison. Dry cells are used to closely observe the inmate until natural processes allow for the ingested contraband to be retrieved. To this end, dry cells lack all linens and moveable items other than a mattress, inmates' clothes are exchanged for a simple smock, and their movements are carefully controlled to prevent them from concealing or disposing of any retrievable contraband."  *Thomas v. Tice*, 948 F.3d 133, 137 (3d Cir. 2020).

[17]  *See* Doc. 98 ¶ 6; Brown Dep. 12:10-24.

[18]  Doc. 99 ¶ 8.

[19]  Brown Dep. 16:22-17:1.

cell walls, causing him to lose feeling in his extremities and to have difficulty sleeping.[20]  Brown claims that he was denied multiple meals during this time, a claim that Defendants counter with prison records showing that Brown was offered three meals a day and voluntarily rejected a total of four meals over the five-day period in cell GA 1016.[21]  Brown also asserts that he was forced to drink water out of the toilet by hand—water that was contaminated with feces from a prior cell inhabitant—because he was not given water to drink and the water to his cell was shut off.[22]  Additionally, Brown claims he was denied basic hygiene supplies like toilet paper, toothpaste, a toothbrush, soap, and access to showers, and was also refused his asthma inhaler.[23]  Brown further attests that he was subjected to racist and homophobic verbal abuse by correctional staff when he voiced complaints about his cell's conditions.[24]

On July 31, 2018, Brown was moved to a different cell, "GA 2016."[25]  He claims that, after being removed from the "bluesing" cell, he was finally given food, water, and a mattress, and that the air temperature was noticeably different.[26]

Beyond the conditions in the "bluesing" cell, Brown complains of alleged medical indifference by various SCI Huntingdon officials.  He attests that he

---

[20]  Doc. 99 ¶ 8.
[21]  *Compare* Doc. 88 ¶ 7, *with* Doc. 98 ¶ 7; *see* Doc. 88-2 at 3-4.
[22]  Doc. 1 ¶ 37; Doc. 99 ¶ 11.
[23]  Doc. 1 ¶ 37.
[24]  *See* Doc. 99 ¶¶ 9-10.
[25]  *See* Doc. 97-4 at 54.
[26]  Doc. 99 ¶¶ 14-15.

complained of symptoms stemming from the ingested piece of metal but that he was either ignored or provided deficient treatment.[27]

Brown filed suit in May 2019, alleging First, Eighth, and Fourteenth Amendment violations, as well as state-law claims of negligence and intentional infliction of emotional distress.[28]   The only claims to survive Rule 12(b)(6) motion practice are Brown's allegations of First Amendment retaliation, Eighth Amendment conditions of confinement and deliberate indifference to serious medical needs, and his state-law claims.[29]   The remaining Defendants include the aforementioned Plocinik, Grove, Kirsch, Franks, Kauffman, and Price, as well as Nurse Nichole Emigh, Unit Manager Cameron Kendrick, and Correctional Officer Shane Weyant.[30]   Brown, however, does not delineate against whom he is asserting his various constitutional and state tort claims.

Defendants move for summary judgment on all claims.[31]   Their Rule 56 motion is fully briefed and ripe for disposition.

## II.    STANDARD OF REVIEW

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses."[32]   Summary judgment is

---

[27]   *See* Doc. 1 ¶¶ 32-33, 40-41, 44-45.
[28]   *See generally* Doc. 1.
[29]   *See* Doc. 35 at 4 ¶ 2.
[30]   *See* Doc. 1 ¶¶ 21-27; Doc. 20 (providing full names of Defendants).
[31]   Doc. 85.
[32]   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[33]  Material facts are those "that could alter the outcome" of the litigation, and "disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct."[34]

At the Rule 56 stage, the Court's function is not to "weigh the evidence and determine the truth of the matter" but rather "to determine whether there is a genuine issue for trial."[35]  The Court must view the facts and evidence presented "in the light most favorable to the non-moving party" and must "draw all reasonable inferences in that party's favor."[36]  This evidence, however, must be adequate—as a matter of law—to sustain a judgment in favor of the nonmoving party on the claim or claims at issue.[37]  A "scintilla of evidence" supporting the nonmovant's position is insufficient; "there must be evidence on which the jury could reasonably find for the [nonmovant]."[38]  Succinctly stated, summary judgment is "put up or shut up time" for the nonmoving party.[39]

---

[33]  FED. R. CIV. P. 56(a).

[34]  *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 262 (3d Cir. 2010) (*quoting Clark v. Modern Grp. Ltd.*, 9 F.3d 321, 326 (3d Cir. 1993)).

[35]  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

[36]  *Thomas v. Cumberland County*, 749 F.3d 217, 222 (3d Cir. 2014).

[37]  *Liberty Lobby*, 477 U.S. at 250-57; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-89 (1986).

[38]  *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 192 (3d Cir. 2015) (quoting *Liberty Lobby*, 477 U.S. at 252) (alteration in original).

[39]  *Daubert v. NRA Grp., LLC*, 861 F.3d 382, 391 (3d Cir. 2017) (quoting *Berkeley Inv. Grp. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006)).

## III.   DISCUSSION

Defendants argue that all of Brown's claims fail as a matter of law.  They assert that (1) Brown has not established unconstitutional conditions of confinement; (2) his claims of medical indifference reflect only a disagreement in the proper course of treatment and thus do not rise to the level of an Eighth Amendment violation; (3) his retaliation claims lack evidence of causation and additionally fail under the "same decision" defense; (4) his state-law claims are precluded by state statutory sovereign immunity; and (5) his official capacity claims are barred by Eleventh Amendment sovereign immunity.  The Court will take these arguments in turn.

### A.      Eighth Amendment – Conditions of Confinement

"[T]he Constitution does not mandate comfortable prisons, and prisons . . . which house persons convicted of serious crimes[] cannot be free of discomfort."[40] Nevertheless, the state cannot subject an inmate to cruel and unusual punishment or "inhumane treatment," such as deprivation of "identifiable human need[s]" like "food, warmth, or exercise."[41]  To prevail on an Eighth Amendment conditions-of-confinement claim, a plaintiff must show both objective and subjective elements.[42] Objectively, the prisoner must demonstrate that "the prison official deprived the

---

[40]   *Thomas v. Tice*, 948 F.3d 133, 139 (3d Cir. 2020) (second alteration in original) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)).

[41]   *See Chavarriaga v. N.J. Dep't of Corr.*, 806 F.3d 210, 226 (3d Cir. 2015) (quoting *Wilson v. Seiter*, 501 U.S. 294, 304 (1991)).

[42]   *See id.*

prisoner of the minimal civilized measure of life's necessities," often referred to as a "sufficiently serious" deprivation.[43]  Subjectively, the prisoner must show that "the prison official acted with deliberate indifference" to the prisoner's "health or safety."[44]  Deliberate indifference means that the defendant "acted or failed to act despite having knowledge that her actions or inaction, as the case may be, would subject the inmate to a substantial risk of serious harm."[45]

Defendants argue that Brown's placement in a "dry cell" in late July 2018 did not violate his Eighth Amendment rights and that Brown has not established that the conditions in his cell were "foul" or "inhuman."[46]  The Court finds significant flaws with both arguments.

First, there is a genuine dispute of material fact regarding whether, from July 26 or 27 to July 31, 2018, Brown was in a dry cell at all.  Brown attests that cell DA 1016 was not a dry cell but rather a specific RHU cell that correctional staff utilized for inflicting punishment on inmates through intentionally unsanitary and harsh conditions.[47]

Other record evidence indicates that DA 1016 may not have been a dry cell, at least not when Brown was confined there.  For example, as explained in *Thomas v. Tice*, a dry cell "is a cell that lacks water—all standing water has been drained

---

[43]   *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 843 (1994); *Wilson*, 501 U.S. at 297).
[44]   *Id.* (citing *Farmer*, 511 U.S. at 834).
[45]   *Id.* at 227 (citing *Farmer*, 511 U.S. at 842).
[46]   Doc. 86 at 15.
[47]   *See* Brown Dep. 12:10-24.

from the toilet, the room's water supply has been shut off, and the sink and toilet have been capped to prevent inmate access."[48]  But according to Brown's verified complaint and declaration, the toilet in cell DA 1016 was neither capped nor drained of water; rather, it contained old water contaminated with feces, from which Brown claims he was eventually forced to drink by hand.

Interrogatory responses from several Defendants likewise infer that DA 1016 was not a dry cell.  When Franks was asked about whether he remembered the conditions of confinement to which Brown was subjected, he responded that Brown "was placed on water and property restriction on 7/26/2018 and moved to GA unit where he could be more easily observed."[49]  There is no indication that a "water and property restriction" along with observation is identical to the unique restrictions imposed in a dry cell.[50]  And Price, when asked about whether she was aware of Brown's injuries from the "bluesing cell," responded that she was not familiar with the term "bluesing," but noted that Brown was "placed in a dry cell on 8/6/2018 for approximately two (2) hours, per Dr. Dancha, for monitoring."[51]  Price does not say anything about Brown being placed in a dry cell for multiple days in late July.

---

[48]  *Thomas*, 948 F.3d at 137.
[49]  Doc. 97-5 at 13.
[50]  Brown's medical records also reflect that Brown was on a "[p]roperty, bedding, and water restriction," *see* Doc. 88-3 at 2, yet they say nothing of Brown being placed in a dry cell in late July.
[51]  Doc. 97-5 at 41.

Finally, it does not appear that Brown was moved to cell DA 1016 because he had ingested or was believed to have ingested contraband (which is the purpose of the dry cell procedure). Rather, from the related misconduct report, it can reasonably be inferred that Brown was placed on a "water, bedding mat[eria]l, [and] cell property" restriction and moved to DA 1016 because he was alleged to have flooded the toilet in his cell, GD 1006.[52] Defendants, moreover, have not proffered any evidence that would establish that Brown was placed in a dry cell so that he could pass the metal he claimed Plocinik put in his food.

The second and more problematic issue with Defendants' argument is that—contrary to Defendants' assertions—Brown has adduced evidence showing that his conditions of confinement in late July violate long-established constitutional prohibitions on cruel and unusual punishment. Thus, even if Brown had been placed in a dry cell for legitimate penological reasons, which is unclear from the record, the conditions he claims he endured would still offend the Eighth Amendment.[53]

As explained above, Brown attests—through his verified complaint, deposition, and declaration—that he was subjected to the following conditions for approximately five days: he had no mattress, bedding, soap, toilet paper,

---

[52] *See* Doc. 97-4 at 46.

[53] *See Young v. Quinlan*, 960 F.2d 351, 365 (3d Cir. 1992) ("Even if Young was properly confined in a dry cell, [prison] officials do not have a license to impose unconstitutional conditions upon him.").

toothbrush, toothpaste, access to a shower, or recreation time; he was refused his

asthma inhaler; he had no fresh water and was eventually forced to drink tainted

water from the toilet by hand; he was denied meals on multiple occasions; the cell

contained human feces and flies and smelled strongly of urine; the cell was

extremely cold and Brown had no blanket or proper clothing to protect him from

the low temperatures.[54]  Such deprivations of basic human needs have repeatedly

been held to violate the Eighth Amendment.[55]  Furthermore, it is difficult to see

how conditions such as lack of potable water, denial of food, or extremely cold

temperatures could serve any penological purpose beyond "unnecessary and

wanton infliction of pain,"[56] even (or, perhaps, especially) in a dry cell setting.

The final step in Brown's conditions-of-confinement claim is to determine

which Defendants could be liable under Section 1983 for the alleged Eighth

Amendment violations.  After all, "a prison official cannot be found liable under

the Eighth Amendment for denying an inmate humane conditions of confinement

unless the official knows of and disregards an excessive risk to inmate health or

---

[54]  Defendants maintain that Brown was properly offered meals, showers, and exercise opportunities but that he refused them.  *See* Doc. 88 ¶¶ 7-9 (citing Brown's DC-17X forms, Doc. 88-2).  This, of course, creates a genuine dispute of material fact that must be decided by a jury, not the Court.

[55]  *See, e.g.*, *Taylor v. Riojas*, 592 U.S. __, 141 S. Ct. 52, 53 (2020) (holding that shockingly unsanitary conditions of confinement for six days, including presence of human feces and "frigidly cold temperatures," offend the Eighth Amendment); *Mammana v. Fed. Bureau of Prisons*, 934 F.3d 368, 373 (3d Cir. 2019) (finding that denial of clothing and bedding while being subjected to low cell temperatures and constant bright lighting could state an Eighth Amendment conditions-of-confinement claim); *Chavarriaga*, 806 F.3d at 228 (holding that denial of potable water for three consecutive days states a conditions-of-confinement claim).

[56]  *Wilson*, 501 U.S. at 298 (quoting *Rhodes*, 452 U.S. at 346).

safety[.]"[57]

According to Brown, he spoke with Weyant on the morning of July 27, relaying his concerns regarding the metal that he ingested and the allegedly deplorable conditions of his cell.[58] Brown claims that Weyant ignored his entreaties and called him racist names.[59] Brown further attests that he encountered "C/O Plocinik, Lt. Franks, C/O Kirsch, C/O Grove," and several other prison officials during "tier checks" on second shift that day, and that these officials took no action and even acknowledged that Brown was "bluesing" for flooding his cell.[60] Brown avers that he also encountered Plocinik, Kirsch, and Grove during meal times, relayed his concerns about the conditions of his cell, and was ignored and denied his food tray.[61]

Brown attests that on July 28 he encountered Weyant during breakfast, and that Weyant denied Brown food and water and again directed racist and homophobic slurs at him.[62] According to Brown, on second shift he informed Plocinik and Kirsch that he was "cold, unclothed, weak, [and] dizzy from lack of food and water," and Kirsch responded that he did not have the authority to move Brown to a different cell and that, even if he did, Brown should "shit out the

---

[57] *Farmer*, 511 U.S. at 837.
[58] Doc. 99 ¶ 9.
[59] *Id.*
[60] *Id.*
[61] *Id.*
[62] *Id.* ¶ 10.

metal" and then they could talk.[63]  Brown maintains that Plocinik told him that, because he was "bluesing," Franks had directed Plocinik not to give Brown any more food trays.[64]

On July 29, Brown claims he was again deprived of breakfast by Weyant.[65] Brown attests that he also spoke at length with Kendrick about his cell conditions, but that Kendrick referred to Brown's misconduct and denied that the conditions in DA 1016 were inhumane.[66]  Brown also claims that he spoke with Kauffman that day about his harsh conditions, but that Kauffman likewise did not take any remedial action.[67]

On July 30, Brown avers that he encountered Kendrick, Kirsch, Grove, and Plocinik at different times throughout the day, but that he was either ignored or deliberately passed over for meals.[68]  The following day, Brown attests that Weyant once again skipped his cell for breakfast.[69]  Later that day, he was finally moved out of cell DA 1016 "upstairs" to cell DA 2016.[70]

Brown has thus adduced evidence that Plocinik, Weyant, Franks, Kendrick, Kirsch, Grove, and Kauffman were aware of his conditions of confinement and

---

[63]  *Id.*
[64]  Doc. 99 ¶ 10.
[65]  *Id.* ¶ 12.
[66]  *Id.*
[67]  *Id.*
[68]  *Id.* ¶ 13.
[69]  *Id.* ¶ 14.
[70]  Doc. 99 ¶ 14; Doc. 97-4 at 54.

were deliberately indifferent to his health and safety. Accordingly, Defendants'

motion for summary judgment on Brown's Eighth Amendment conditions-of-

confinement claim must be denied as to these seven Defendants.

### B.   Eighth Amendment – Medical Indifference

In the context of prison medical care, the Eighth Amendment "requires

prison officials to provide basic medical treatment to those whom it has

incarcerated."[71] To establish an Eighth Amendment deliberate indifference claim

regarding inadequate medical care, a plaintiff must show "(i) a serious medical

need, and (ii) acts or omissions by prison officials that indicate deliberate

indifference to that need."[72] A serious medical need is "one that has been

diagnosed by a physician as requiring treatment or one that is so obvious that a lay

person would easily recognize the necessity for a doctor's attention."[73]

Deliberate indifference by prison officials may be evidenced by intentional

refusal to provide care known to be medically necessary, delayed provision of

medical treatment for non-medical reasons, denial of prescribed medical treatment,

or denial of reasonable requests for treatment resulting in suffering or risk of

injury.[74] Deliberate indifference to serious medical needs is an exacting standard,

---

[71] *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).

[72] *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003).

[73] *Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987).

[74] *See Durmer v. O'Carroll*, 991 F.2d 64, 68 & n.11 (3d Cir. 1993) (quoting *Lanzaro*, 834 F.2d at 346).

requiring a showing of "unnecessary and wanton infliction of pain."[75]  Claims

sounding in mere medical negligence will not suffice.[76]

Once again, Brown does not specify which Defendants he is asserting his

medical indifference claims against.  Nevertheless, the Court need not parse

Brown's summary judgment materials for the answer.  It is clear from the record

that, because Brown was receiving prompt and continual medical care from

medical professionals and he simply disagreed with the treatment provided, his

Eighth Amendment claim cannot withstand Rule 56 scrutiny.

The undisputed record shows that Brown began receiving medical attention

only several hours after the metal contamination incident.  Brown himself admits

that Price—SCI Huntingdon's Medical Director—visited his cell, listened to his

complaints, and told Brown to put in a sick call related to his concerns.[77]

The following morning, according to Brown's medical records (which both

parties submitted), he was seen around 11:00 a.m. by LPN Ashley Whitesel, who

noted Brown's concerns regarding ingestion of the metal and physically examined

Brown.[78]  She reported that Brown denied having a bowel movement since the

incident and that he likewise denied "any blood or active bleeding from his

rectum."[79]  Whitesel then notified E. Gessel (presumably a supervisor in the

---

[75]  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (citation omitted).
[76]  *Rouse*, 182 F.3d at 197.
[77]  Brown Dep. 13:9-11.
[78]  Doc. 88-3 at 6, 10.
[79]  *Id.* at 10.

medical department) and also carbon copied the Deputy Superintendent for
Centralized Services.[80]  Whitesel additionally entered a psychological referral for
Brown, as she noted that Brown—during the examination—had "used a sock
puppet to conversate" with her.[81]  Brown was seen again by another nurse later that
day around 9:00 p.m., and was noted to be "standing at his door with a sock
puppet" but without "signs or symptoms of distress."[82]

It appears that, on July 28, 29, and 30, 2018,  the only contact medical staff
had with Brown was to offer tuberculosis testing, which Brown refused.[83]  On July
31, Nurse (and defendant) Emigh visited Brown, and he again reported that he had
swallowed a small piece of metal on July 26 but had not yet passed the metal in a
bowel movement.[84]  Brown was placed on sick call and Gessel was notified of
Brown's concerns.[85]

The next day, an X-ray was ordered.[86]  The X-ray, which appears to have
been completed the same day it was ordered, showed a "small, twisted piece of
metal" in the sigmoid colon.[87]  Repeat X-rays were ordered for follow-up
evaluation.[88]  On August 3, Brown was offered a repeat abdominal X-ray to assess

---

[80]  *Id.* at 6-7.
[81]  *Id.* at 8-9.
[82]  *Id.* at 11.
[83]  *Id.* at 12-14.
[84]  Doc. 88-3 at 15-16.
[85]  *Id.*
[86]  *Id.* at 20.
[87]  *Id.* at 21.  Brown described the object on the X-ray film as looking like "a fishing hook with a sharp pointing end."  Doc. 99 ¶ 15.
[88]  Doc. 88-3 at 22.

whether the metal had passed, which he refused.[89]  During this interaction, Brown expressed frustration that it took so long to get medical treatment following the July 26 incident and, according to the medical records, stated that he would "put another sick call in next week if the abdominal pain is still persisting."[90]

Another request for a follow-up abdominal X-ray was entered on August 6.[91] That study, interpreted by a board-certified radiologist, showed a "wire-like curved metallic foreign body in the pelvis measuring about 3 x 0.5 cm that is probably in the rectum . . . and in a similar location to 8/01/2018."[92]  Without explanation, medical staff at SCI Huntingdon deemed this a "second foreign body," ordered that Brown be placed in a dry cell, and held his planned transfer to a different prison.[93] Brown was placed in a dry cell on August 6 but released several hours later.[94]

Brown continued to complain of abdominal pain and rectal bleeding, so another X-ray was ordered and performed on August 7.[95]  This X-ray again showed a foreign body in the rectum that Gessel deemed "small and very passable."[96]  The next day, a repeat X-ray was performed, which—for the first time—did not identify a foreign body in Brown's gastrointestinal tract.[97]

---

[89]  *Id.* at 26-28.
[90]  *Id.* at 26.
[91]  *Id.* at 29.
[92]  *Id.* at 41.
[93]  *See id.* at 30-33, 37,
[94]  *See* Doc. 88-3 at 37-38, 40.
[95]  *Id.* at 42-43.
[96]  *Id.* at 43.
[97]  *Id.* at 45.

Simple review of the medical treatment Brown received during the time at issue is fatal to Brown's Eighth Amendment medical indifference claim. Contrary to Brown's allegations, it is clear that he received timely and frequent medical attention throughout the incident. Although Brown argues that nothing was done to treat his symptoms from the ingested metal (like prescribing pain medication), such an argument demonstrates only disagreement with SCI Huntingdon's medical providers about how to treat the small piece of metal in his gastrointestinal tract, which they believed would pass on its own. Mere disagreement as to proper medical care is insufficient to support a claim of medical indifference.[98]

Furthermore, as to any medical indifference claims targeting correctional staff, those claims fail as well. Brown was under the care of medical professionals beginning only hours after the incident. It is well settled that correctional staff, who are not medical experts, may rely on the ongoing treatment by medical professionals to address medical complaints from a prisoner.[99] "[A]bsent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be

---

[98] *Lanzaro*, 834 F.2d at 346; *see also Pearson v. Prison Health Serv.*, 850 F.3d 526, 535 (3d Cir. 2017) ("Because 'mere disagreement as to the proper medical treatment' does not 'support a claim of an [E]ighth [A]mendment violation,' when medical care is provided, we presume that the treatment of a prisoner is proper absent evidence that it violates professional standards of care." (internal citation omitted)).

[99] *See Durmer*, 991 F.2d at 69; *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004) ("If a prisoner is under the care of medical experts . . ., a non-medical prison official will generally be justified in believing that the prisoner is in capable hands.").

chargeable with the Eighth Amendment scienter requirement of deliberate indifference."[100]  There is no evidence of mistreatment or lack of treatment in the instant case, so Brown cannot establish deliberate indifference by nonmedical staff. Brown has likewise failed to proffer evidence of deliberate indifference by any medical personnel.  Summary judgment, therefore, must be granted in Defendants' favor on Brown's claim of deliberate indifference to serious medical needs.

## C.    First Amendment Retaliation

Although a prisoner's constitutional rights are necessarily circumscribed, an inmate still retains First Amendment protections when they are "not inconsistent" with prisoner status or with the "legitimate penological objectives of the corrections system."[101]  To establish a First Amendment retaliation claim, a prisoner must show that (1) "he was engaged in constitutionally protected conduct," (2) he suffered an "adverse action" by prison officials sufficient to deter a person of ordinary firmness from exercising his First Amendment rights, and (3) the inmate's protected conduct was a "substantial or motivating factor" in the prison officials' decision to take the adverse action.[102]

Brown fails to set out the elements of his retaliation claim in his complaint, so the Court is left to piece together Brown's allegations to determine the protected

---

[100]  *Spruill*, 372 F.3d at 236.
[101]  *Wisniewski v. Fisher*, 857 F.3d 152, 156 (3d Cir. 2017) (quoting *Newman v. Beard*, 617 F.3d 775, 781 (3d Cir. 2010)).
[102]  *Id.* (quoting *Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001)); *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003) (quoting *Rauser*, 241 F.3d at 333).

conduct and the adverse actions taken in response to that conduct.  As far as the Court can ascertain, the protected conduct Brown alleges he was engaged in appears to be the filing of (1) multiple grievances, (2) a PREA complaint against Plocinik, and (3) a separate federal lawsuit naming Plocinik and numerous other SCI Huntingdon officials.  The alleged adverse actions taken against Brown appear to be placement of metal in his food and his five-day stint in the "bluesing" cell.  For their part, Defendants do not challenge these first two elements of Brown's retaliation claim.  Instead, they maintain that Brown cannot establish the third prong—causation.[103]

There are a variety of ways to prove causation for a First Amendment retaliation claim.  One method is to show "unusually suggestive" timing between the protected conduct and the adverse action.[104]  When a plaintiff relies solely on circumstantial evidence of temporal proximity at summary judgment, the time between the protected conduct and the adverse action is often measured in days rather than weeks or months.[105]  However, there is no "bright line rule limiting the length of time that may pass between a plaintiff's protected speech and an actionable retaliatory act by a defendant."[106]  Another approach is to demonstrate

---

[103] *See* Doc. 86 at 22.
[104] *See Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007).
[105] *See Conard v. Pa. State Police*, 902 F.3d 178, 184 (3d Cir. 2018).
[106] *Id.*

"a pattern of antagonism coupled with timing."[107]  Finally, causation can be inferred "from the evidence gleaned from the record as a whole."[108]

Brown appears to argue that his retaliation claim should survive as to every Defendant.  Brown is incorrect.  First, he does not delineate which Defendants were responsible for the adverse actions against him (save for Plocinik being culpable for allegedly spiking Brown's food).  As to the less obvious claim that he was placed in the "bluesing" cell in retaliation for his protected conduct, Brown fails to make the required causal connection for the remaining Defendants.  That is, Brown fails to establish either that the other eight Defendants were responsible for the adverse action, or that Brown's protected conduct was a substantial or motivating factor in the decision to take the adverse action, or both.

The primary deficiency with Brown's claims is that he has failed to adduce evidence as to why Franks, Weyant, Kendrick, Kirsch, Grove, Kauffman, Emigh, and Price would retaliate against him.  It is true that Brown filed grievances against some of these Defendants in February and March 2018,[109] but those grievances were filed five and four months, respectively, before the alleged retaliatory actions.  Consequently, if Brown is attempting to use temporal proximity alone to show

---

[107]  *DeFlaminis*, 480 F.3d at 267.

[108]  *Watson v. Rozum*, 834 F.3d 417, 424 (3d Cir. 2016) (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000)).

[109]  *See* Doc. 97-4 at 19 (February 24, 2018 grievance naming Kauffman); *id.* at 21-22 (illegible grievance filed in March 2018 apparently naming Weyant, as restated in Facility Manager's appeal response); *id.* at 48 (initial grievance response to February 27, 2018 grievance naming two nurses, one of which was Emigh).

causation, he is out of luck.  The Third Circuit has held that even less time (three months) between the protected conduct and the adverse action, without more, is insufficient to maintain a retaliation claim.[110]

As for Brown's PREA complaint, that complaint was filed against Plocinik only.  Brown does not explain or offer evidence as to why a PREA complaint against Plocinik would cause the other eight Defendants to retaliate against him.

Finally, Brown has not produced evidence that any Defendant besides Plocinik was aware of the separate federal lawsuit before the "bluesing" occurred. That lawsuit was lodged in federal court on August 1, 2018,[111] but waivers of service of summons were not mailed to the defendants until December 2018.[112] Although Brown includes one sentence in his declaration that Kauffman "attempted to inquire about the lawsuit" on July 26, 2018,[113] Brown has not offered evidence beyond speculation that Kauffman—the Superintendent of SCI Huntingdon—was responsible for Brown's placement in the "bluesing" cell or for any related condition of confinement during that period.  In other words, Brown has not established that Kauffman took the adverse action.

---

[110] *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007) ("Although there is no bright line rule as to what constitutes unduly suggestive temporal proximity, a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation to defeat summary judgment.").

[111] *See Brown v. Gildea*, 3:18-cv-1527, Doc. 1 (M.D. Pa. Aug. 1, 2018).

[112] *See id.*, Doc. 31 (M.D. Pa. Dec. 4, 2018).

[113] *See* Doc. 99 ¶ 7.

Brown, however, has carried his burden on his retaliation claim against Plocinik.  As explained above, Brown has offered evidence that Plocinik became aware of the other lawsuit one day before the alleged food contamination incident occurred.  This type of unusually suggestive temporal proximity can demonstrate causation.  Brown has also attested that Plocinik made several remarks to him that indicate retaliatory animus.[114]  Additionally, Brown provided an affidavit from inmate Hector Vargas, who stated that on August 2, 2018, he overheard Plocinik threatening Brown with sexual assault and warning him, "You put in a lawsuit, you get screw[ed]."[115]  This evidence is more than sufficient to withstand Defendants' Rule 56 challenge as to the retaliation claim against Plocinik.

Defendants alternatively argue that, even if Brown can establish a *prima facie* case of retaliation, prison officials would have taken the same action by placing Brown in a dry cell to pass the metal piece.[116]  This argument fails for multiple reasons.  Initially, as noted above, it is unclear that Brown was placed in a dry cell in July 2018.  It is equally unclear that Brown was moved to cell DA 1016 based on the ingested metal, as other record evidence indicates that he was moved because he had purportedly flooded his cell.  Furthermore, many of the alleged

---

[114] *See id.* ¶ 15 (attesting that on August 1, 2018, Plocinik yelled at Brown, "I told you not to send out that lawsuit, you did this to yourself"); *id.* ¶ 16 (attesting that on August 2, 2018, Plocinik warned Brown, "You put in lawsuits, you get screw[ed].").

[115] Doc.97-3 at 29.

[116] *See Rauser*, 241 F.3d at 334 (explaining that "prison officials may still prevail [on a First Amendment retaliation claim] by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest.").

conditions of confinement in cell DA 1016 would serve no legitimate penological

purpose, and thus it cannot be said that prison officials would have made the same

decisions absent the protected conduct.  Finally, Defendants cannot argue that

spiking an inmate's food with metal is reasonably related to a legitimate

penological interest.  Thus, even if Brown had been put in a dry cell and that

placement was justifiable, it would not defeat Brown's retaliation claim against

Plocinik.

### D.     State-Law Claims

Brown asserts state-law claims of negligence and intentional infliction of

emotional distress (IIED).  Once again, he does not specify which Defendants he

believes are liable for these state-law torts.  Defendants contend that state statutory

sovereign immunity bars Brown's IIED claims and most of his negligence claims.

Any remaining negligence claims against medical providers (*i.e.*, Price and

Emigh), Defendants assert, fail on the merits.

Commonwealth parties acting within the scope of their employment

generally are immune from suit except when immunity is explicitly waived.[117]

Pennsylvania's General Assembly has carved out certain limited exceptions from its

grant of sovereign immunity to Commonwealth actors.[118]  Section 8522(b) of Title

---

[117] *See* 1 PA. CONS. STAT. § 2310; 42 PA. CONS. STAT. §§ 8521, 8522(a).
[118] *See generally* 42 PA. CONS. STAT. §§ 8521, 8522.

42 of the Pennsylvania Consolidated Statutes provides ten narrow categories[119] where the state has waived its sovereign immunity for claims involving negligent conduct by Commonwealth parties.[120]  This state statutory immunity applies to both negligent and intentional torts committed by Commonwealth actors.[121]  Because statutory immunity is an affirmative defense, the defendant bears the burden of establishing that his conduct was within the scope of employment.[122]

It cannot be said that Plocinik was acting within the scope of employment when he allegedly contaminated Brown's food with a piece of metal.  Such conduct is not the kind a correctional officer is employed to perform, nor is it in any way "actuated . . . by a purpose to serve the employer."[123]  Thus, Brown's claim of IIED against Plocinik can withstand Defendants' Rule 56 challenge.  Brown's related negligence claim against Plocinik may proceed as well as an alternative theory of recovery.[124]

---

[119] The ten exceptions set forth in 42 PA. CONST. STAT. § 8522(b) concern: (1) vehicle liability; (2) medical-professional liability; (3) care, custody or control of personal property; (4) Commonwealth real estate, highways and sidewalks; (5) potholes and other dangerous conditions; (6) care, custody or control of animals; (7) liquor store sales; (8) National Guard activities; (9) toxoids and vaccines; and (10) sexual abuse.

[120] *See id.* § 8522(a), (b).

[121] *See La Frankie v. Miklich*, 618 A.2d 1145, 1149 (Pa. Commw. Ct. 1992).

[122] *Justice v. Lombardo*, 208 A.3d 1057, 1068 (Pa. 2019).

[123] *See id.* at 1067-68 (citing RESTATEMENT (SECOND) OF AGENCY § 228 (1958)); *cf. Costa v. Roxborough Mem'l Hosp.*, 708 A.2d 490, 493 (Pa. Super. Ct. 1998) ("[A]n assault committed by an employee upon another person for personal reasons or in an outrageous manner is not actuated by an intent to perform the business of the employer and, as such, is not within the scope of employment.")

[124] Brown argues that 42 PA. CONS. STAT. § 8550 precludes immunity for intentional or willful misconduct by an employee, but that statute applies to municipal or local government employees, not Commonwealth employees.  *See generally* 42 PA. CONS. STAT. § 8541 *et seq.*;

Brown's claims of IIED against the other six correctional Defendants (Franks, Weyant, Kauffman, Kendrick, Grove, and Kirsch) likewise survive Defendants' motion for summary judgment.  A reasonable jury could find that intentionally subjecting an inmate to the conditions Brown swears he endured falls outside the scope of employment and is egregious enough to implicate IIED under Pennsylvania law.[125]  Brown's claims of negligence against these officials may proceed as an alternative theory of recovery should a jury find that Defendants were acting outside the scope of employment.[126]

That leaves Brown's IIED and negligence claims against Price and Emigh. Neither can survive Rule 56 scrutiny.  The allegations and attestations against Price and Emigh do not, as a matter of law, rise to the level of outrageous conduct required for an IIED claim.  At most, Brown's assertions sound in professional

---

*see Zion v. Nassan*, 283 F.R.D. 247, 264-65 (W.D. Pa. 2012) (citing *La Frankie*, 618 A.2d at 1149 n.4).

[125] The Pennsylvania Supreme Court has not yet explicitly recognized the tort of intentional infliction of emotional distress.  *See Taylor v. Albert Einstein Med. Ctr.*, 754 A.2d 650, 652 (Pa. 2000).  The Third Circuit has predicted that the state's high court will ultimately adopt the Restatement (Second) of Torts' formulation.  *Williams v. Guzzardi*, 875 F.2d 46, 50-51 (3d Cir. 1989); *see also Mills v. City of Harrisburg*, 589 F. Supp. 2d 544, 558 n.13 (M.D. Pa. 2008) (citing *Taylor*, 754 A.2d at 652).  A claim of IIED requires conduct that is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society."  *Hoy v. Angelone*, 720 A.2d 745, 754 (Pa. 1998) (quoting *Buczek v. First Nat'l Bank of Mifflintown*, 531 A.2d 1122, 1125 (Pa. Super. Ct. 1987)).

[126] The determination of whether a Commonwealth employee was acting within the scope of employment "is ordinarily a question of fact for the jury" unless "neither the facts nor the inferences to be drawn from them are in dispute."  *Justice*, 208 A.3d at 1068.

negligence (*i.e.*, medical malpractice), and Brown confirms that construction in his summary judgment briefing.[127]

The problem for Brown is that, to prosecute a medical malpractice claim under Pennsylvania law, a plaintiff is required to file a certificate of merit pursuant to Pennsylvania Rule of Civil Procedure 1042.3 within 60 days of filing a complaint.[128]  It does not appear that Brown has complied with his obligations under Pennsylvania law.[129]  Compliance with Rule 1042.3 is a substantive legal requirement for a state-law medical malpractice claim.[130]  Nevertheless, because fair notice to a plaintiff of a Rule 1042.3 deficiency is required before dismissal or entry of judgment,[131] the Court will provide Brown with an opportunity to cure this deficiency before granting judgment in favor of Price and Emigh on his medical malpractice claims.

### E.    Official Capacity Claims

Brown sued all Defendants in their individual and official capacities.[132] The official capacity claims seeking monetary damages, however, are barred by

---

[127]  *See* Doc. 97 at 10 (citing, *inter alia*, 42 PA. CONS. STAT. § 8522(b)(2)).

[128]  *See* PA. R. CIV. P. 1042.3(a).

[129]  On June 21, 2019, Brown filed a document entitled "Certificate of Merit Within Motion Showing Extraordinary Circumstances."  Doc. 10.  This document claims that Brown could not comply with Rule 1042.3 because of his incarcerated status and retaliation by SCI Huntingdon officials.  *See id.*  This document does not meet the requirements of Pennsylvania Rule of Civil Procedure 1042.3, nor can the Court waive such requirements.

[130]  *See Liggon-Redding v. Estate of Sugarman*, 659 F.3d 258, 265 (3d Cir. 2011) (holding that Pennsylvania's certificate of merit requirement is substantive state law that must be applied by a federal court sitting in diversity).

[131]  *See Schmigel v. Uchal*, 800 F.3d 113, 115, 124-25 (3d Cir. 2015).

[132]  *See* Doc. 1 ¶¶ 14-27.

Eleventh Amendment sovereign immunity.

The Eleventh Amendment to the United States Constitution prevents federal courts from entertaining lawsuits—by United States citizens or citizens of foreign states—brought against a state.[133]  This immunity from private suit extends to state agencies as well as state officials acting in their official capacity, because such lawsuits are essentially civil actions "against the State itself."[134]  States may waive this immunity if they choose, but Pennsylvania has explicitly not waived its immunity with respect to claims brought under Section 1983.[135]  There are two exceptions to the Eleventh Amendment's bar to private suits against nonconsenting states: (1) "Congress may abrogate a state's immunity" and (2) "parties may sue state officers for *prospective* injunctive and declaratory relief."[136]

Brown argues that he can circumvent Eleventh Amendment sovereign immunity because he is asserting a "policy or custom" claim under *Monell v. Department of Social Services of the City of New York.*, 436 U.S. 658 (1978).[137] Brown's reliance on *Monell* is misplaced.  *Monell* permits a Section 1983 claim for an unconstitutional policy or custom to be brought against a municipality or local

---

[133] U.S. CONST. amend. XI; *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 267-68 (1997); *Hans v. Louisiana*, 134 U.S. 1, 10 (1890).

[134] *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).

[135] *See* 42 PA. CONS. STAT. § 8521(b); *Downey v. Pa. Dep't of Corr.*, 968 F.3d 299, 310 (3d Cir. 2020); *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 254 & n.5 (3d Cir. 2010) (citing 42 PA. CONS. STAT. § 8521(b)).

[136] *Wheeling & Lake Erie Ry. Co. v. Pub. Util. Comm'n of Pa.*, 141 F.3d 88, 91 (3d Cir. 1998) (emphasis added) (citing, *inter alia*, *Ex parte Young*, 209 U.S. 123 (1908)).

[137] *See* Doc. 97 at 11.

government, not a state government (or a state employee in their official capacity, which is the same as the state itself).[138]  Brown may be confusing a *Monell* claim with one asserting supervisory liability for implementing an unconstitutional policy or custom.[139]  To the extent that Brown is asserting supervisory liability based on implementation of an unlawful policy or custom, such an argument falls under his Eighth Amendment conditions-of-confinement claim.  Summary judgment, therefore, must be granted in Defendants' favor on Brown's official capacity claims seeking monetary damages.

## IV.   CONCLUSION

Based on the foregoing, the Court will grant in part and deny in part Defendants' motion (Doc. 85) for summary judgment.  The Court will also provide Brown an opportunity to cure the Rule 1042.3 deficiency for his professional liability claims.  An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
Chief United States District Judge

---

[138]  *See Monell*, 436 U.S. at 690-91.
[139]  *See Argueta v. U.S. Immigr. & Customs Enf't*, 643 F.3d 60, 72 (3d Cir. 2011) (citing *Brown v. Muhlenberg Township*, 269 F.3d 205, 216 (3d Cir. 2001)).